45 So.3d 403 (2010)
Blaine ROSS, Appellant,
v.
STATE of Florida, Appellee.
No. SC07-2368.
Supreme Court of Florida.
May 27, 2010.
As Revised on Denial of Rehearing September 8, 2010.
*406 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
Blaine Ross was convicted of the January 7, 2004, robbery and first-degree murders of his parents, Richard and Kathleen Ross. Ross, who was 21 at the time of the murders and living with his parents, appeals the judgments of conviction of robbery and first-degree murder and sentences of death. We have mandatory *407 jurisdiction. See art. V, § 3(b)(1), Fla. Const.
After carefully reviewing the issues raised on appeal, we reverse the convictions and sentences of death because of the police conduct in interrogating Ross on January 9, 2004. Specifically, the police, over a period of several hours of custodial interrogation, deliberately delayed administration of the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), obtained inculpatory admissions, and when the warnings were finally administered midstream, minimized and downplayed the significance of the warnings and continued the prior interrogationall of which undermined the effectiveness of Miranda. In accordance with our precedent and the precedent of the United States Supreme Court, we conclude that under the totality of the circumstances, the waiver of the defendant's rights against self-incrimination was not voluntary, knowing, and intelligent, and the statements were not voluntarily given. Thus, for the reasons addressed below, we conclude that the police interrogation violated both Miranda and the defendant's constitutional rights under the Fifth Amendment to the United States Constitution and article I, section 9, of the Florida Constitution. Because the admission of the multiple inculpatory statements cannot be considered harmless beyond a reasonable doubt, we are compelled to reverse for a new trial.

FACTS
In reviewing the facts of this case, we focus on both the circumstances surrounding the murder and the police interrogation that produced the inculpatory statements. Richard and Kathleen Ross were murdered on January 7, 2004, in their home in Bradenton, Florida. Their son, Blaine Ross, called 911 after discovering them in their bed covered in blood.
At the time of their deaths, Kathleen Ross was in the process of obtaining a divorce from her husband, Richard, after she discovered that he was having an affair. Although Richard had not vacated the premises, he was spending considerable time away from the house.
Ross was living at his parents' house, but spent substantial time with his sixteen-year-old girlfriend, Erin. On January 7, 2004, the day of the murder, Ross and his girlfriend, Erin, planned to drive to Cape Coral in order to buy drugs. According to Erin, Ross was not at her house when she went to sleep around 10:30 or 11:00 at night on January 6, but he was there when she woke up the next morning.
The morning of January 7, before leaving for Cape Coral, Ross and Erin first went to the GTE Federal Credit Union where Ross attempted to withdraw money. When his attempt was unsuccessful, he went inside and spoke to an employee, Barbara Curtis. Ross gave Curtis an ATM card, claiming that the account was his and that his mother changed the personal identification number (PIN). When Curtis looked up the account information, however, Kathleen Ross was the only person listed as having access to the account. Ross told her that his mother was out of town, but he could not provide any number for her. Ross continued to ask Curtis to change the PIN, but she refused.
After Ross was unable to obtain any money at the bank, he stopped by Checkers, went by Sam's Club and filled his car with gas, and stopped at a Circle K where Ross tried again, unsuccessfully, to use the ATM card. Ross returned to his house with Erin and asked her to wait in his room while he talked with his parents. He proceeded to his parents' bedroom, where the murders had occurred.
*408 After he discovered his parents' bodies, Ross and Erin went outside while Ross called 911. When the police arrived, Ross was in his front yard with Erin, who was visibly upset. The police found the exterior lights on, and all of the blinds within the house were closed. Ross's parents appeared to have died while sleeping, with significant injuries to their heads. Blood was splattered across the bedroom, all over the walls, and up to the ceiling. The victims also had ropes around their necks.[1] Although clothing was scattered around the room, it was still folded and partially stacked, which was inconsistent with a typical burglary. After the bodies were moved, police found keys, a checkbook, and a wallet in the pillowcase on which Richard Ross was lying.
Police found no signs of forced entry, but the kitchen sliding glass door was partially open. Ross's fingerprints were found on the inside sliding glass door. In the garage, police found a bag containing baseball equipment; however, the compartment that would normally hold bats was unzipped and empty. Ross's fingerprints were found on a cigarette lighter, which was on top of the partially empty baseball bag.
The State also presented evidence that Ross's black pants had spots of blood on them that was consistent with the blood of Kathleen and Richard Ross. Law enforcement officers found his pants in Erin's bedroom after Erin's mother gave the officers permission to search the residence. The pants were not the ones Ross was wearing at the time he discovered his parents' bodies and called 911.
Dr. Vega, the medical examiner, performed an autopsy and determined that the cause of death for both victims was blunt impact head injuries. He estimated that the time of death was between 3 a.m. and 5 a.m. on January 7. Dr. Vega opined that neither victim moved after the initial injury because there was no blood staining beyond the area already uncovered. He found no defensive injuries and opined that the victims were asleep when initially struck. The injuries were consistent with being struck by a bat. Richard Ross was hit at least twice, but possibly more. Kathleen Ross was struck at least four times, but likely more than four.
The State presented evidence that Ross had a financial motive for the crime. Specifically, shortly before his parents were killed, Ross made several withdrawals from his mother's account, totaling $1,401.50. On January 6, 2004, Ross and his mother signed a contract which stated, "I, Kathleen Ross, has [sic] loaned Blaine Ross $1400 that will be paid back in full as soon as possible. Blaine will never ask for Sam's Club card or any other money."
On January 7, after the police responded to Ross's 911 call, Detective William J. Waldron talked to Ross at the scene and described Ross as very quiet, calm, and withdrawn. After Detective Waldron interviewed some neighbors, he returned to Ross and found him crouched down near a vehicle to avoid the media. Ross appeared particularly stressed based on the media's arrival. Ross asked Detective Waldron if they could go somewhere to talk, and Detective Waldron suggested the sheriff's office, to which Ross agreed. Ross and Erin were then taken to the Criminal Investigation Division (CID) of the Manatee County Sheriff's Office.
*409 Law enforcement officers interrogated Ross multiple times.[2] On January 7, after arriving at CID, Detective Waldron interviewed Ross four times throughout the day and into the early morning hours of January 8. Although Ross was at the police station for about twelve hours, the total time that he was interviewed on January 7 and 8 was a little less than four hours. In between the interviews, Ross was given breaks whenever he asked, was permitted to be alone in a common area near the elevator, was not restrained in any manner, and was not supervised. Detective Waldron conducted these interviews at a conference table in a large room.
The interviews were very conversational, but on occasion, the detective confronted Ross with discrepancies between his statement and statements from other witnesses. In the third and fourth interviews, another detective was also present, and the detectives became more direct with portions of Ross's story that were inconsistent. During the same day, the police also took statements from Erin and her mother, as well as other potential witnesses.
During the interviews on January 7 and 8, Ross was repeatedly assured he was not being arrested. After Ross finished providing the statements, a detective took Ross to Erin's house. After Ross was interviewed on January 7 and 8, he called Detective Waldron four times and left messages. In the last message, he stated:
Hello Detective Waldron, this is Blaine Ross. I'm calling in regards to what's going on. I have some questions, um, regarding the case and then some things that have been brought up to me in the recent time. Please give me a call back. ...
On January 9, Ross and his sister arrived at the sheriff's office, where the victim advocate's office was located. Ross came to see the victim advocate so he could buy shoes. At the time of the visit, he was still barefoot because the police had taken his shoes when he was first questioned, and he was not permitted to obtain any of his other shoes from his house as it was considered a crime scene.
When Ross arrived, Detective Waldron asked Ross to come see him when he finished with his meeting because he had received Ross's messages and had some more questions. Ross met with Detective Waldron as requested.
Detective Waldron believed that the January 9 interrogation was his last chance to talk to Ross without an attorney present, so he decided to change the location to a room where the interrogation could be videotaped. The room was much smaller than the room where Ross was initially interviewed. Inside the room, there was a small desk and three chairs. Detective Waldron sat relatively close to Ross. Ross's chair was in the corner of the room and he was, in essence, blocked in with a desk at one side and Detective Waldron in front of him. Ross was still barefoot. At least one other law enforcement officer was in the room, and at various times throughout the interview, other officers entered and exited the room, passing notes to Detective Waldron.
Detective Waldron was the primary interrogator throughout the questioning. Initially, he answered many of Ross's questions concerning the process of an investigation. After they talked about Ross's concerns, Detective Waldron questioned *410 Ross about his prior statements given on January 7 and 8. The questioning became more accusatory, and at times, Detective Waldron raised his voice. Detective Waldron confronted Ross with evidence that Ross had lied regarding significant aspects of Ross's prior statements. He then informed Ross that police had found the pants that Ross wore on the night his parents were killed and the pants had blood on them that matched the crime scene. The interrogation continued for about four hours in the same small room with Detective Waldron and other officers before Miranda warnings were finally administered. During the unwarned portion of the interrogation, Detective Waldron constantly referred to the bloody pants and emphasized that this evidence could not be disputed. Ross finally acknowledged that this evidence "[p]uts me at the crime scene." Shortly after that, Ross admitted that it was a possibility that he killed his parents:
You made me dig inside and think about it, and you've also given me hard evidence that puts me at the crime. And I can'tI can'tI can'tI can't remember if I did this or not. I don't know. I mean, youyou have solid evidence, blood on my pants and everything, but I don't remember doing this, if I did it.
From this point on, Ross repeatedly asserted that he may have committed the crime but "blacked out" and had no memory of it. He further provided additional statements that implied he had reason to commit the murders:
I can tell you that I didn't plan to kill my parents. I can tell you that I do bottle things up, and things that you've said does [sic] make sense. They do make sense to me, that I can [sic] have done this. I could have been so angry, done this. But I don'tI can't put myself there. I don't remember if I was there, so I can't tell you if I did it or not.
At approximately 7 p.m., Detective Waldron left the interrogation room. About fifteen minutes later, he returned and Ross asked, as he had done previously, if he could see his sister "one more time." Detective Waldron left the room again and returned shortly telling Ross, "I can't find her." Although Detective Waldron left the room for the ostensible purpose of checking if Ross's sister was still in the building, at trial he testified that he did not believe that she was in the building and he personally was not making any efforts to find her. When Detective Waldron returned, he eventually administered Miranda warnings and, under circumstances more fully explained in our analysis, Ross signed a written waiver. After more questioning by Detective Waldron based on the prior interrogation and further equivocation by Ross, Ross finally confessed that he killed his parents but did not remember committing the act.
Ross: You were right about a couple of things. I was angry at my dad. I wasn't angry with my mom, she was trying to help me, she was giving me money. But whenyou were right that I didn't do this on purpose. I remember dropping Mikey off[unintelligible] his neighborhood, I remember being in my house. I didn't do this on purpose.
Waldron: I know you didn't.
Ross: It was like I had just woken up, and I was standing there, not nextnot next to my parents, but in front of their bed. I had a [unintelligible]I don't know why, I don't know what triggered me to do it. I know I was angry at my dad,[[3]] but I don't know why I did this. ...
*411 He stated that he "woke up" after the murders, realized what he had done, and tried to make it look like a robbery. When he discussed what happened after the murders, he also confessed to certain actions that later evidence showed that he did not do. Specifically, when Detective Waldron asked about Kathleen Ross's missing jewelry, Ross stated that he "[j]ust grabbed it" in order to "cover [his] tracks." In fact, Ross did not take the jewelry.[4]
Ross was subsequently arrested for the murder of his parents. On January 12, Detective Waldron arrived at the jail to talk to Ross based on a request made by Ross. After an initial discussion, the detective provided new Miranda warnings to Ross. During their discussion, Ross further answered additional questions as to where he disposed of the evidence. However, none of this evidence was ever discovered.
At trial, Ross presented a defense, including the testimony of several neighbors who reported that, a few days before the murders, somebody had jiggled their doors or made noises outside their windows. Ross also presented an expert in false confessions, Dr. Gregory DeClue, to support the theory that the confession he made was coerced and unreliable.[5] He testified that there are factors that increase the likelihood of false confessions, many of which were present in this case. These factors include youth, immaturity, inexperience, low intelligence, mental illness, intoxication, and withdrawal from drugs. Police also use isolation to increase anxiety. Further, the police use certain techniques that increase the risk of a false confession, including escalating the pressure exerted on a suspect and the suspect's anxiety, exaggerating the evidence, providing information about the crime scene, and giving justifications why a person should confess, such as closure. After hearing all the evidence, the jury convicted Ross of two counts of first-degree murder and one count of robbery.
Following a penalty phase in which Ross put on mental mitigation from two experts as to his substantially impaired mental state at the time of the crime, the jury recommended a sentence of death by a vote of eight to four for each murder. The trial court imposed sentences of death after finding two aggravators: a prior violent felony conviction (based on the contemporary murder convictions) and that the murders were committed during the course of a robbery (merged with pecuniary gain). The court found three statutory mitigating factors: Ross had no significant criminal history (given little weight); he acted under the influence of extreme mental or emotional disturbance (proven only as to drug use and given moderate weight); and his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (proven only as to drug use and given moderate weight). The trial court rejected age as a statutory mitigator and found and weighed nonstatutory mitigation, including giving moderate weight to his history of substance abuse.

ANALYSIS
On appeal, Ross raises five issues: (1) whether the trial court erred in denying *412 the motion to suppress Ross's statements on January 8 and January 9; (2) whether the trial court erred in allowing the State to introduce Ross's January 12 statement; (3) whether the State failed to demonstrate that the FDLE serologist was qualified to testify to the statistical significance of the DNA evidence; (4) whether the circumstantial evidence is insufficient to prove robbery and premeditation; and (5) whether the death penalty is disproportionate. In connection with the proportionality argument, Ross claims that he has a severe mental illness and that the trial court ignored "uncontroverted evidence" regarding his mental state. Because we conclude that multiple statements made by Ross during the January 9 interrogation should have been suppressed and that the admission of those statements was not harmless beyond a reasonable doubt, we address only that issue in depth.[6]
Prior to trial, Ross filed a motion to suppress.[7] Following an evidentiary hearing, which included the admission of the recorded interrogation of Ross by the police, the trial court denied the motion to suppress. The trial court's findings included the following: (1) Ross was not in custody prior to the reading of the Miranda warnings on January 9; (2) Ross voluntarily waived his Miranda rights; and (3) Ross's statements were made voluntarily. The trial court further found that (1) Ross did not confess before being read his Miranda rights; and (2) no evidence was submitted to show that the detectives deliberately withheld Miranda warnings until Ross confessed.
On appeal, Ross claims that the "trial court erred in allowing the state to introduce the videotaped in-custody confession obtained by Detective Waldron by means of multiple violations of appellant's rights protected by the United States and Florida Constitution." Both the United States and Florida Constitutions provide that persons shall not be "compelled" to be witnesses against themselves in any criminal matter. U.S. Const. amend. V; art. I, § 9, Fla. Const; see also Traylor v. State, 596 So.2d 957, 964 (Fla.1992) (stressing that under the basic contours of Florida's constitutional privilege against self-incrimination, "a main focus of Florida confession law has always been on guarding against one thingcoercion"). Based on these federal and state constitutional guarantees, if a defendant confesses during a custodial interrogation, in order for the confession "to be admissible in a criminal trial, the State must prove that the confession was not compelled, but was voluntarily made." Ramirez v. State, 739 So.2d 568, 573 (Fla. 1999).
Prior to Miranda, "the admissibility of an accused's in-custody statements was *413 judged solely by whether they were `voluntary' within the meaning of the Due Process Clause." Oregon v. Elstad, 470 U.S. 298, 304, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In Miranda, "the United States Supreme Court enunciated a bright-line rule to guard against compulsion and the coercive nature and atmosphere of custodial interrogation and `assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process.'" Ramirez, 739 So.2d at 573 (quoting Miranda, 384 U.S. at 469, 86 S.Ct. 1602). To protect the right against self-incrimination, the Supreme Court required that any individual held for interrogation must be clearly informed as to his or her rights, including the "right to remain silent, that any statement he does make may be used as evidence against him, and ... [the] right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444, 86 S.Ct. 1602. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Id.
The Supreme Court in Miranda concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Id. at 467, 86 S.Ct. 1602. Therefore, "unless and until [the Miranda] warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant]." Id. at 479, 86 S.Ct. 1602.
"The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." Id. at 476, 86 S.Ct. 1602. The Supreme Court has also recognized that the prophylactic Miranda warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." Elstad, 470 U.S. at 305, 105 S.Ct. 1285 (quoting New York v. Quarles, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)). As recognized in Elstad, the Miranda exclusionary rule sweeps more broadly than the Fifth Amendment itself: "A Miranda violation does not constitute coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements." Id. at 307 n. 1, 105 S.Ct. 1285 (emphasis omitted). This presumption is irrebuttable for the purposes of the State's case in chief. Id. at 307, 105 S.Ct. 1285.[8]
These protections are equally applicable under the Florida Constitution. As this Court has recognized, "[t]he protections enunciated in Miranda have been part of this State's jurisprudence for over a century pursuant to the Florida Constitution." Ramirez, 739 So.2d at 573; see also Traylor, 596 So.2d at 964-66. Traylor explains the contours of our state constitutional law:
The basic contours of Florida confession law were defined by this Court long ago under our common law. We recognized the important role that confessions play in the crime-solving process and the great benefit they provide; however, because of the tremendous weight accorded confessions by our courts and the significant potential for compulsion both psychological and physicalin obtaining such statements, a main focus of Florida confession law has always been *414 on guarding against one thingcoercion.... The test thus is one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession. This determination is to be made by the judge, in the absence of the jury, based on a multiplicity of factors, including the nature of the questioning itself.
Id. at 964 (footnote omitted).
In this case, the trial court concluded that Ross was not in custody on January 9 prior to the reading of the Miranda warnings, that Ross voluntarily waived his rights, and that the statements were made voluntarily. As we explained in Connor v. State, 803 So.2d 598, 605 (Fla.2001), when reviewing a trial court's ruling on a motion to suppress, "mixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach." We defer to a trial court's findings of fact as long as they are supported by competent, substantial evidence, but we review de novo a trial court's application of the law to the historical facts. See Cuervo v. State, 967 So.2d 155, 160 (Fla.2007).
The actual facts of the interrogation in this case are uncontroverted; only the application of the law to the facts is at issue. In reviewing the issues related to the January 9 interrogation and statements, we address: (a) whether and when the interrogation of Blaine Ross became custodial, necessitating the administration of Miranda warnings; (b) whether, under the totality of the circumstances, the waiver of the Miranda rights was voluntary, knowing, and intelligent and whether the statements made after the waiver were voluntary; and (c) whether the error in the admission of the statements was harmless error beyond a reasonable doubt.

A. Pre-Miranda Statements Custodial Interrogation
The first issue centers on whether the interrogation became custodial on January 9 prior to the time the Miranda warnings were administered, particularly after the detective confronted Ross with evidence that the victims' blood was found on his pants. Determining whether the defendant was "in custody" so as to require the administration of Miranda warnings involves a mixed question of law and fact subject to independent review. Connor, 803 So.2d at 605-06. The United States Supreme Court explained why this determination should be subject to independent review:
Classifying "in custody" as a determination qualifying for independent review should serve legitimate law enforcement interests as effectively as it serves to ensure protection of the right against self-incrimination. As our decisions bear out, the law declaration aspect of independent review potentially may guide police, unify precedent, and stabilize the law.
Thompson v. Keohane, 516 U.S. 99, 115, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). If Ross was subjected to custodial interrogation, then he should have been administered Miranda warnings.
Police are not required to give Miranda warnings to every potential suspect. Miranda warnings apply only to in-custody interrogations. Hunter v. State, 8 So.3d 1052, 1063 (Fla.2008), cert. denied, ___ U.S. ___, 129 S.Ct. 2005, 173 L.Ed.2d 1101 (2009); see also Miranda, 384 U.S. at 441-42, 86 S.Ct. 1602. The reason for requiring Miranda warnings at this stage is because "interrogation in certain custodial circumstances is inherently coercive and ... statements made under those circumstances are inadmissible unless the suspect is specifically warned of *415 his Miranda rights and freely decides to forgo those rights." Duckworth v. Eagan, 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (quoting Quarles, 467 U.S. at 654, 104 S.Ct. 2626).
For Miranda purposes, custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 86 S.Ct. 1602. The determination of whether a person was in custody for purposes of Miranda depends on "how a reasonable person in the suspect's situation would perceive his circumstances." Yarborough v. Alvarado, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). The United States Supreme Court explained this analysis as follows:
Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.
Id. at 663, 124 S.Ct. 2140 (quoting Thompson, 516 U.S. at 112, 116 S.Ct. 457).
This Court has adopted the same objective, reasonable-person framework in determining whether a suspect was in custody. See Connor, 803 So.2d at 605. "[I]t must be evident that, under the totality of the circumstances, a reasonable person in the suspect's position would feel a restraint of his or her freedom of movement, fairly characterized, so that the suspect would not feel free to leave or to terminate the encounter with police." Id. To analyze the case-specific facts that are relevant to determining this issue, the Court considers the following four factors:
(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; [and] (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Ramirez, 739 So.2d at 574.
With this framework in mind, we now proceed to determine at what point in time Ross was in custody. Although the four factors provide the structure of our analysis, the ultimate inquiry is twofold: (1) the "circumstances surrounding the interrogation;" and (2) "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Yarborough, 541 U.S. at 663, 124 S.Ct. 2140.
The first of the four factors, the manner in which police summon the suspect for questioning, weighs in favor of the State. Ross voluntarily came to the sheriff's office for a meeting with a victim's advocate. While he was at the office, Detective Waldron requested that Ross see him before he left, and Ross agreed.
We next turn to the second factorthe purpose, place, and manner of questioning. Initially, Detective Waldron asked Ross to again provide a statement of Ross's activities regarding the last day he was with his mother and questioned him as to inconsistencies in his story. However, at the point when Detective Waldron informed Ross about the bloody pants, the detective's focus shifted from merely questioning a witness to attempting to obtain a confession and pressuring Ross to admit his involvement in the crime. The detective repeatedly *416 told Ross that he knew Ross committed the crime and the only question remaining was why. This type of questioning, which was highly confrontational and accusatorial, lasted for hours and took place in a very small room at the station with at least two officers in the room. Moreover, at this point, when Ross asked for a smoke break, the detective told him to smoke in the room, while the questioning continued. This factor clearly supports a conclusion that the defendant was in custody.
The third factor to consider is the extent to which Ross was confronted with evidence of his guilt. This factor also weighs in favor of a finding that Ross was in custody. Ross was confronted with very strong evidence of his guilt during the January 9 interviewmost importantly, that pants Ross wore on the night in question had blood on them that matched the crime scene. Detective Waldron referred to the bloody pants throughout the interview and how this evidence could not be disputed. Ross finally acknowledged that this evidence "[p]uts me at the crime scene."
At various points after this time, when Ross denied having any involvement in his parents' murders, Detective Waldron stressed, "The evidence says you did." Detective Waldron constantly referred to the blood on the pants as proof that Ross was at the crime scene that night and, throughout the interview, accused Ross of killing his parents. Questioning by Detective Waldron included:
Waldron: I know how that blood got there, Blaine. When you brutally, cold-blooded beat your parents to death, when you smashed in their heads and beat them to death ....
Waldron: And then you put that rope that was in the garage and you put it around your mother's neck, and you put it around your father's neck, and you slowly methodically, cold-bloodedly pulled it tighter and tighter and tighter, Blaine. After smashing in their heads. That's how you got that blood on your pants, those black Dickies that you were wearing Tuesday. ...
Waldron: You want to see Erin go to prison now? ... Is that what you want? You want to bring all these people down with you? For what you did? The time is now to be a man. And the evidence doesn't lie.

Detective Waldron repeated variations of this type of accusatorial questioning over a period of hours before the Miranda warnings were given and after Ross was confronted with the blood on his pants.
The fourth and final factor to consider is that Ross was never informed he was free to leave. At the point when Ross was informed that the police had evidence that blood on his pants matched the crime scene, a reasonable person would not believe he or she was free to leave. Moreover, all of the circumstances after this point conveyed the clear impression that he was not free to leave. After the interview turned accusatory and Ross asked for a cigarette break, Detective Waldron told Ross that he could simply smoke in the room. Ross responded, "I was also going to say you could handcuff me or something to make sure I don't run." This situation stands in contrast to how Ross was handled in his prior interviews, where he was permitted to go outside, take a break from the interrogation, and smoke a cigarette.
Later during the January 9 interrogation, Ross asked to speak with his sister who had accompanied him to the station. He was not permitted to talk to her outside the interrogation roomshe was brought to Ross. He asked for her again, and he was left in the room while Detective Waldron said that he would try to find *417 her. When Ross asked if he was being charged with the crime, Detective Waldron avoided a direct answer by asking Ross what he thought should happen. Only once did Detective Waldron assure Ross that he was not currently being arrested, but this was moments before Detective Waldron provided Ross with Miranda warnings and after Ross made the admissions that he could have killed his parents. Therefore, the final factor weighs in favor of concluding that the interrogation was custodial.
Ultimately, as we have stated, the factors enunciated provide the basis for the twofold inquiry: (1) the "circumstances surrounding the interrogation"; and (2) "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Yarborough, 541 U.S. at 663, 124 S.Ct. 2140; see also Connor, 803 So.2d at 606. In considering these factors in conjunction with each other, we conclude that the January 9 interview became a custodial interrogation. Although Ross initially went to the sheriff's office voluntarily, this is the only factor that weighs in favor of finding that the January 9 questioning was not an in-custody interrogation. The January 9 interview was held in a small room with multiple officers, and Ross was placed in a corner with Detective Waldron sitting in front of him. The manner and purpose of the interview was not merely to interview a witness and obtain his story. Detective Waldron was attempting to obtain incriminating statements or a change in Ross's story by confronting him with significant evidence that allegedly placed him at the crime scene and insisting that the police already knew he committed the crime.
Once the police informed Ross that they had his bloody pants that matched the crime scene, a reasonable person would not have felt at liberty to terminate the interrogation and leave. At this point the officer should have advised Ross as to his Miranda rights.
Our holding here is consistent with our precedent regarding when a defendant is in custody. See Ramirez, 739 So.2d 568. In Ramirez, an officer transported the suspect, Ramirez, to the police station, where Ramirez was questioned in a small interrogation room by two detectives. Id. at 572. Ramirez was never told that he was free to leave, and the officers clearly indicated that they considered him a suspect and knew he was involved in the crime. See id. at 574. After reviewing the four relevant factors, this Court concluded that Miranda warnings should have been given because any reasonable person in Ramirez's position would have believed that he was in custody at the time of the interrogation. Id. We observed that "[s]hort of being handcuffed and being told that he was under arrest, we cannot perceive of circumstances that would be more indicative of a custodial interrogation than the circumstances of the interrogation" in Ramirez. Id.
Likewise, in Mansfield v. State, 758 So.2d 636, 644 (Fla.2000), we concluded that the defendant was in custody for purposes of Miranda where consideration of the Ramirez factors "inevitably" led to that conclusion:
Mansfield was interrogated by three detectives at the police station, he was never told he was free to leave, he was confronted with evidence strongly suggesting his guilt, and he was asked questions that made it readily apparent that the detectives considered him the prime, if not the only, suspect.
See also Wolliston v. State, 961 So.2d 1141, 1142 (Fla. 4th DCA 2007) (holding that defendant was in custody, despite the fact that the interrogation occurred in his own home, because the defendant was confronted *418 with the presence of illegal drugs and was not informed that he was free to leave).
In accordance with the case law governing when Miranda warnings must be given, we conclude that the officers should have provided Miranda warnings during the January 9 interrogation before the interrogation turned accusatorial and the officers confronted Ross with the bloody pants. Accordingly, any prewarning statements made by Ross after this point should have been suppressed.

B. Validity of Statements After Miranda Waiver
We next address the issue of whether, under the totality of the circumstances, the waiver of the Miranda rights was voluntary, knowing, and intelligent and whether the statements made after the waiver were voluntary. The dissent agrees with our determination that Ross was in custody at the time Ross was confronted with evidence of the bloody pants. The dissent objects to our analysis of the validity of the statements given after the Miranda warnings, asserting that this Court did not give proper deference to the trial court's finding of facts that the delay in administering the Miranda warnings was not deliberate. However, although deference is to be accorded to credibility findings, the issue of the admissibility of the postwarning statements is a mixed question of law and fact. See Thomas v. State, 894 So.2d 126, 136 (Fla.2004) (holding that regarding whether a waiver of Miranda rights is voluntary, knowing, and intelligent, "[a]ppellate courts should ... accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment[s]" (quoting Connor, 803 So.2d at 608)).
As this Court and the United States Supreme Court have made clear, "the ultimate issue of voluntariness is a legal rather than factual question." Ramirez, 739 So.2d at 575 (citing Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). The State bears the burden of showing that "the confession was not compelled, but was voluntarily made." Id. at 573. Further, where a confession is obtained after the administration of Miranda warnings, "the State bears a `heavy burden' to demonstrate that the defendant knowingly and intelligently waived his or her privilege against self-incrimination and the right to counsel." Id. at 575 (citing Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); Fare v. Michael C., 442 U.S. 707, 724, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); Miranda, 384 U.S. at 475, 86 S.Ct. 1602; W.M. v. State, 585 So.2d 979, 981 (Fla. 4th DCA 1991)).
In the ordinary case, the teachings of Miranda dictate that the warnings will be administered once custodial interrogation begins and thus the prophylactic effect of Miranda will be served. This, however, is a case where the administration of the Miranda warnings was delayed for several hours into the custodial interrogation. See Missouri v. Seibert, 542 U.S. 600, 609, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion) ("The technique of interrogating in successive, unwarned and warned phases raises a new challenge to Miranda.").
Miranda was intended to address and minimize the coercive effects of interrogation and guard against police techniques "likely ... to disable [an individual] from making a free and rational choice" *419 about speaking. Miranda, 384 U.S. at 464-65, 86 S.Ct. 1602. Whether a defendant validly waived his rights is a twofold inquiry:
First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
Ramirez, 739 So.2d at 575 (quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)) (internal quotation marks omitted).
In reviewing such challenges, courts must remain vigilant regarding whether a defendant was given an actual choice in order to guard against the potential danger of violating a defendant's constitutional right against self-incrimination. Ensuring that police do not use intimidation, coercion, or deception in obtaining a waiver also helps to protect the integrity of the truth-seeking process, including guarding against the danger of false confessions. We thus review the United States Supreme Court precedent and this Court's precedent as to whether the subsequent statements were admissible or should have been suppressed as being both a violation of the underlying principles of Miranda and a violation of Ross's constitutional rights under the United States and Florida Constitutions.

1. Relevant Case Law
In Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the United States Supreme Court held that the failure to administer the Miranda warnings before eliciting a confession does not necessarily render any subsequently warned statement inadmissible and that the admissibility of such statements must turn on whether the subsequent waiver is voluntarily, knowingly, and intelligently made. Id. at 310-11, 314-15, 105 S.Ct. 1285. The eighteen-year-old defendant in Elstad first admitted guilt when he was questioned without Miranda warnings in the living room of his home while his mother was in the kitchen area, a few steps away. Id. at 315, 105 S.Ct. 1285. After this initial confession, he was taken to the sheriff's headquarters where, approximately one hour later and after a full warning and waiver of his Miranda rights, he gave a complete statement detailing his participation in the crime. Id. at 301, 314-15, 105 S.Ct. 1285. The officers made no promises or threats during questioning at either the defendant's residence or the sheriff's headquarters. Id. at 301-02, 105 S.Ct. 1285. In holding the second statement admissible, the United States Supreme Court stated:
Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. ... We hold today that a suspect who has once responded to unwarned *420 yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.
Id. at 318, 105 S.Ct. 1285 (emphasis supplied).
Elstad thus rejected a rigid rule that would render inadmissible a statement given after Miranda warnings were administered solely because Miranda warnings were not given earlier. However, Elstad also cautioned against a rigid rule that would simply allow the admission of all statements given after Miranda warnings. Rather, courts must examine "the surrounding circumstances and the entire course of police conduct." Id. "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." Id. at 310, 105 S.Ct. 1285. If a suspect made an unwarned but "clearly voluntary" earlier admission, a subsequent properly warned confession need not be suppressed, so long as the careful and thorough administration of the Miranda warning is given and the Miranda rights are waived. Id. at 310-11, 105 S.Ct. 1285. Thus, the condition that rendered the initial "unwarned statement inadmissible" is "cure[d]" as to the subsequent statements after Miranda warnings are properly given. Id. at 311, 105 S.Ct. 1285.
The Court in Elstad limited its holding to situations where police did not engage in "deliberately coercive or improper tactics" in obtaining the initial statements. Id. at 314, 105 S.Ct. 1285. A situation in which the police did engage in improper tactics was addressed by this Court in Ramirez v. State, 739 So.2d 568 (Fla.1999), where the police delayed providing a seventeen-year-old defendant with his Miranda warnings until after he made incriminating statements, and when those warnings were finally provided, the officers undertook a "concerted effort to minimize and downplay the significance of the Miranda rights." Id. at 575. After examining Elstad, this Court held that determining whether a subsequent confession is voluntarily given requires an examination of the totality of the circumstances. Id.
This Court concluded that the circumstances surrounding the statements in Ramirez were distinguishable from Elstad. First, although the officers had probable cause to arrest Ramirez at the time of questioning, they delayed providing Miranda warnings until after he made incriminating statements. Then the police failed to provide him with a careful and thorough administration of Miranda warnings, instead minimizing the significance of the warnings. This Court found that the officers in that case instead employed a concerted effort to minimize and downplay the significance of the Miranda rights, thus exploiting the statements previously made to the officers so that Ramirez would not exercise his rights. Ramirez, 739 So.2d at 576. This Court noted that Ramirez had just turned seventeen years old and that the officers in that case lulled the young defendant into a false sense of security by telling the suspect that they were not arresting him and did not permit him to contact his parents before questioning. Id. at 574, 576-77. Finally, the officers administered the Miranda rights orally and did not secure a written waiver until after Ramirez had fully confessed to his involvement in the crime. Id. at 578. This Court therefore held that Ramirez's confession should have been suppressed. Id.
In Davis v. State, 859 So.2d 465, 472 (Fla.2003), the Court applied Elstad and distinguished Ramirez to conclude that *421 the postwarning statements were admissible. The facts of Davis involve only brief initial questioning and no indication of a concerted effort to undermine the Miranda warnings. The officers informed Davis that they were there to discuss the disappearance of his girlfriend's mother, Ms. Robinson. Id. During the initial ten-minute discussion with the two officers, Davis admitted that he killed Ms. Robinson. Id. at 471. Upon hearing this admission, a detective immediately read Davis his Miranda warnings and obtained a signed written waiver. Id. Davis then proceeded to draw a map to the victim's body and gave a recorded confession. Id. We concluded that none of the circumstances that rendered Ramirez's warned confession inadmissible were present in Davis. Relying on Elstad, this Court held that the circumstances surrounding Davis's warned confession properly "cured" the condition that rendered the unwarned statement inadmissible. Id. at 472.
The circumstances of the police conduct in Elstad and Davis stand in stark contrast to the circumstances in Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), which involves the intentionally delayed administration of Miranda warnings. In Seibert, the police in fact engaged in tactics of deliberately and intentionally withholding Miranda warnings. Specifically, the officer who questioned the suspect admitted that he intentionally withheld Miranda warnings and relied on an interrogation technique he had been taught: "question first, then give the warnings, and then repeat the question `until I get the answer that she's already provided once.'" Id. at 606, 124 S.Ct. 2601. In a plurality opinion, four justices agreed that Miranda was violated when the officer intentionally elicited an unwarned confession and then used that unwarned confession to elicit a second warned confession. The plurality discussed how such intentional techniques strike at the very heart of the purpose of Miranda warnings and increase the risk of inducing a coercive confession:
Just as "no talismanic incantation [is] required to satisfy [Miranda's] strictures," it would be absurd to think that mere recitation of the litany suffices to satisfy Miranda in every conceivable circumstance. "The inquiry is simply whether the warnings reasonably `conve[y] to [a suspect] his rights as required by Miranda.'" The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as Miranda requires.
Id. at 611-12, 124 S.Ct. 2601 (Souter, J., plurality opinion) (alterations in original) (citations omitted) (quoting California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981); Duckworth, 492 U.S. at 203, 109 S.Ct. 2875).
The plurality stated that the following facts were relevant to whether Miranda warnings delivered "midstream" could be effective in accomplishing their object: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id. at 615, 124 S.Ct. 2601. The plurality explained that the circumstances of Seibert's interrogation "challeng[e] the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a *422 choice about continuing to talk." Id. at 617, 124 S.Ct. 2601.
Because this was a plurality opinion, Justice Kennedy's opinion concurring in the judgment becomes a pivotal focus in determining the impact and ramifications of Seibert.[9] Justice Kennedy stressed that he firmly believed in the correctness of the decision in Elstad because it "reflect[ed] a balanced and pragmatic approach to enforcement of the Miranda warning." Id. at 620, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment). Specifically, he expressed concern with extending Miranda and did not believe that a subsequent voluntary statement made after Miranda warnings was tainted simply because a police officer made a good-faith mistake in determining exactly when Miranda warnings were required. However, like the plurality, he was equally concerned about the situation in Seibert where police used a two-step interrogation technique "designed to circumvent Miranda," id. at 618, 124 S.Ct. 2601, because such a tactic "simply creates too high a risk that postwarning statements will be obtained when a suspect was deprived of `knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" Id. at 621, 124 S.Ct. 2601 (quoting Moran, 475 U.S. at 424, 106 S.Ct. 1135). He concluded:
The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.
Id. at 622, 124 S.Ct. 2601. These curative measures must "ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver." Id. Justice Kennedy posited that factors such as a "substantial break in time and circumstances between the prewarning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." Id. Alternatively, he posited that "an additional warning that explains the likely inadmissibility of the prewarning *423 custodial statement may be sufficient." Id.
From a review of these cases, a tension emerges between two competing principles. On the one hand, suppression of a statement based on an innocent good-faith failure to immediately administer Miranda warnings when a defendant is in custody would neither serve the purposes of Miranda nor vindicate Fifth Amendment rights. Suppressing truly voluntary and uncoerced statements would also not serve the interests of justice. On the other hand, allowing police to deliberately delay administering Miranda warnings with the hope that the defendant will confess or make inculpatory statements and then belatedly warn the defendant of the rights frustrates the prophylactic rule of Miranda. Police tactics that subject a defendant to repeated accusatorial custodial interrogation heighten the risk not only that the confession will be involuntary but also that it may in fact be unreliable.
Based on these principles and our review of the caselaw, we conclude that the issue before us is not only whether the police deliberately withheld the Miranda warnings in an impermissible "question first and warn later" technique under Seibert but whether under the totality of the circumstances the waiver was voluntary, knowing, and intelligent and whether the statements made after the waiver were voluntary under Elstad and our own precedent in Ramirez. The issue of involuntariness and coercion directly implicates the defendant's constitutional right against self-incrimination under both the Fifth Amendment and article I, section 9, of the Florida Constitution.
Focusing on whether the statements were voluntarily given is consistent with the holdings in both Elstad and Seibert. We agree with the dissent that Seibert applies once the determination is made that the police deliberately delayed administration of the Miranda warnings. However, the totality of the circumstances analysis under Elstad also includes a multiplicity of factors that impacts the ultimate determination of voluntariness. We thus disagree with the dissent that administration of the Miranda warnings alone will suffice to render the statements admissible, absent a deliberate delay. The United States Supreme Court's opinion in Elstad and this Court's precedent in Ramirez support an application of a totality of the circumstances analysis when warnings are delivered midstream during an ongoing interrogation.[10]
*424 The caselaw demonstrates that the analysis of the admissibility of statements made following a custodial interrogation and after the delayed administration of Miranda warnings is based on the totality of the circumstances, with the following being factors important in making this determination: (1) whether the police used improper and deliberate tactics in delaying the administration of the Miranda warnings in order to obtain the initial statement;[11] (2) whether the police minimized and downplayed the significance of the Miranda rights once they were given;[12] and (3) the circumstances surrounding both the warned and unwarned statements including "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first."[13] In addition, there are other circumstances to consider on a case-by-case basis, such as the suspect's age, experience, intelligence, and language proficiency.[14]

2. Application of Law to Facts

a. Improper and Deliberate Tactics in Delaying the Miranda Warnings
First, we review whether the police used improper and deliberate tactics in delaying the administration of the Miranda warnings in order to obtain the initial statement. This record in fact affirmatively establishes that, in marked contrast to both the United States Supreme Court opinion in Elstad and this Court's opinion in Davis, the police conducted the January 9 interrogation in a manner that *425 arose from a deliberate decision among numerous officers, including the sheriff himself, to delay the administration of the Miranda warnings in order to attempt to elicit a confession. As mentioned above, Detective Waldron believed that this would be his last opportunity to question Ross before Ross obtained an attorney. Before the interview, the sheriff spoke to Detective Waldron, informing Detective Waldron that he was counting on him to "get closure on this." Detective Waldron and the sheriff discussed how the interview should be conducted, and the sheriff, along with numerous other officers, watched the entire proceeding from another room.
Further, Detective Waldron testified at trial that he knew his department's general orders required him to read Miranda rights to a suspect before the questioning turned to an accusatory stage. However, he deliberately chose not to follow this policy, asserting that it was merely a guideline.[15] In defending this decision, Detective Waldron asserted that while the sheriff did not explicitly tell him to violate the general policies, the sheriff gave him guidance on how this interview should proceed and since the sheriff was watching the entire interview, he would have stepped in if he disagreed with the detective's decisions.
Finally, the manner of questioning before Miranda rights were given and the length of time that the highly accusatorial questioning lasted demonstrate that this delay was deliberate. See Elstad, 470 U.S. at 300-01, 314, 105 S.Ct. 1285 (holding that the postwarning statements were admissible where defendant confessed immediately after officer informed defendant why the police were questioning him); Davis, 859 So.2d at 471 (holding that the postwarning statements were admissible where the initial discussion was only ten minutes). Prior to the time when the Miranda warnings were administered, Detective Waldron constantly accused Ross of committing the crimes based on blood found on Ross's pants. After hours of intense and highly accusatorial questioning, the police eventually wore down Ross's will until Ross responded to repeated questioning: "This is the scary part, now I think that I did do it."[16] The detective repeatedly attempted to elicit a full confession from Ross, telling him that confessing to a crime that happened in the heat of the moment was different from confessing to a premeditated murder.
The length of time this interrogation continued without Miranda warnings distinguishes this case from Elstad and from Davis. While the length of time is not determinative, it bears noting that cases in which no intentional conduct was found involved what appeared to be relatively brief initial interrogations and certainly nothing approximating the several hours of custodial interrogation without Miranda warnings involved in this case.
In arguing that the above conduct does not violate either Elstad or Seibert, the State relies on the fact that Ross had not *426 made a full confession before Miranda warnings were given, asserting that if Detective Waldron was intentionally attempting to avoid Miranda, he would have waited until after Ross fully confessed.[17] We have already rejected this argument. See Ramirez, 739 So.2d at 572, 578 (finding that a midstream Miranda warning violated the defendant's constitutional rights even though the defendant had only confessed to breaking into the victim's house prior to the warnings and, subsequent to the warnings, confessed to being involved in the murder). While the detective certainly would have preferred to have obtained a complete confession before he administered the Miranda warning, he had already obtained multiple damaging admissions over the many hours prior to the time the Miranda warnings were given.[18] He may have believed that Ross would not make any further inculpatory statements.
A violation of Elstad or Seibert depends not solely on whether a full confession was obtained before the warnings were given but also on whether the continuing custodial interrogation and delayed administration of Miranda was a deliberate attempt to elicit incriminating statements in a coercive manner, undermining the very purpose of Miranda. Miranda itself addressed "interrogation practices ... likely... to disable [an individual] from making a free and rational choice" about speaking and prohibited the State from using "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444, 464-65, 86 S.Ct. 1602.
The State also asserts that Detective Waldron did not delay Miranda warnings, but merely waited until he received additional incriminating evidence: the discovery of a ski mask with blood on it. This claim of an innocent good-faith mistake on the part of Detective Waldron in delaying Miranda warnings until more incriminating evidence was received is inconsistent with the facts in the record. This case does not involve a situation where only one officer was involved and, contrary to the dissent's assertion, this determination is not a question solely of Detective Waldron's credibility but rather a totality of the circumstances inquiry. See United States v. Street, 472 F.3d 1298, 1314 (11th Cir.2006).[19]
Further, even under the case law cited by the dissent, the government bears the burden of establishing that the delay in administering the Miranda warnings was *427 not deliberate. See United States v. Stewart, 536 F.3d 714, 719 (7th Cir.), cert. denied, ___ U.S. ___, 129 S.Ct. 741, 172 L.Ed.2d 729 (2008). In this case, the trial court determined only that there was no evidence submitted to show that the detectives deliberately withheld Miranda until after Ross confessed, thus impermissibly shifting the burden of proof. Further, the trial court did not determine the credibility of Detective Waldron's explanation in light of the totality of the relevant circumstances surrounding the interrogation.[20]
Even if the trial court had assessed Detective Waldron's credibility, a finding which would be entitled to deference,[21] a determination of the deliberateness in delaying warnings does not turn solely on the reasons Detective Waldron gave for delaying the administration of the warnings. Detective Waldron was the only officer who testified as to why the law enforcement officers failed to give Miranda warnings. However, he was not the only officer involved in the decision as to when the Miranda warnings were to be administered. He consulted with his supervisors, was told how to proceed, and conducted the interview as requested. Although he knew his actions in delaying the Miranda warnings were contrary to his department's general orders, he did not believe that he violated the law because he knew the sheriff was watching the interview and relied on his belief that the sheriff would stop the interview if the detective's interrogation violated Ross's Miranda rights.
In addition, this improper questioning lasted for several hours after this point and continued in an extremely accusatorial manner where Ross was repeatedly told that his denials were not accepted. Other officers at times entered the room during the interrogation and also watched the interrogation from a separate video room. In addition, prior to receiving the ski mask, the police had the following incriminatory evidence: Ross's recent admissions that it was possible that he killed his parents, Ross's bloody pants, evidence that Ross was attempting to take his mother's money, and prior incriminating statements from Ross.
Based on the above analysis, we conclude that rather than merely making a good-faith mistake, the police used improper and deliberate tactics in delaying the administration of the Miranda warnings in order to obtain the initial statement.[22]

*428 b. Significance of Miranda Rights Minimized and Downplayed

We next review whether the police minimized and downplayed the significance of the Miranda rights once they were given. This factor is important to ensure that a suspect who is provided with a tardy administration of the Miranda warnings truly understands the importance and the effect of the Miranda warnings in light of the problems faced when warnings are delivered midstream. While a "careful and thorough administration of Miranda warnings serves to cure the condition that made an unwarned statement inadmissible," Davis, 859 So.2d at 471, where police minimize and downplay the significance of the warnings, the very purpose of Miranda is undermined. See Ramirez, 739 So.2d at 576.
As Justice Kennedy explained in Seibert, if a deliberate two-step strategy is employed, then the postwarning statements must be excluded unless curative measures are taken that will "ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver." Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment) (emphasis supplied). As the Seibert plurality similarly stated, when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, "they are likely to mislead and `depriv[e] a [suspect] of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" Id. at 613-14, 124 S.Ct. 2601 (Souter, J., plurality opinion) (first alteration in original) (quoting Moran, 475 U.S. at 424, 106 S.Ct. 1135).
For the reasons addressed below, we conclude that the significance of the Miranda rights was minimized and downplayed based on the following facts: (1) prior to providing Ross with his Miranda rights, Detective Waldron minimized the significance of the rights by asserting they were only a matter of procedure; (2) prior to the warnings, the detective lulled Ross into a false sense of security by asserting that he was not arresting him at that time; (3) when Ross indicated a hesitancy in talking, the detective did not stop the interrogation immediately; and (4) rather than informing Ross that his prior incriminating statements could not be used against him, Ross was reminded about his earlier admissions, implying that exercising the right to remain silent would be futile.
*429 Immediately prior to providing Ross with his Miranda rights, Detective Waldron stated to Ross:
Waldron: There's a couple of things that I need to go over with you real quick. There's a couple of things I discovered, and before we go any further I want to cover this with you, it's just a matter of procedure, um, based on everything we're talking about.

Ross: So am I being arrested?
Waldron: Nope. At this time you and I are talking, okay? And I would like to talk to you some more. But before I can do that I need to go over this. You're not in handcuffs or anything like that, okay?
This strategy, employed after the hours of unwarned interrogation, de-emphasized the significance of the Miranda warnings. By referring to it as a matter of procedure, the detective conveyed the clear impression that the warnings were merely a bureaucratic formality. After making the remarks to Ross, Detective Waldron then showed Ross a written Miranda form and told Ross, "I got to read this to you, Blaine." The following colloquy ensued:
Waldron: Having these rights in mind you wish to talk to us now?
Ross: I don'tI can't tell you anything different.[[23]]
Waldron: And that's up to you.
Ross. So, I'm 
Waldron: I can't make your decision for you.
Ross: I wantI'd really like to talk to my sister, and since she's not here
Waldron: We tried to get in touch with her, get her back here.
Ross: I don't know what I'm going to do. I don't know what's going to happen, and
Waldron: Well, I'm willing to talk to you if you want. We're trying to get in touch with your sister now[[24]] soyou're indicating that you do want to talk to me; correct?
Ross: Yes.
Waldron: Okay, if you would, please sign right there.
After having Ross sign the waiver of Miranda warnings, Detective Waldron then asked Ross about a ski mask that they found in his car with blood on it, and Ross provided an innocent explanation for the ski mask.[25] At that point, the interview turned back to their prior discussion. Detective Waldron reminded Ross of his prior statements as follows:
Like I was saying before, earlier, there's a lot of things that happened today, and there's a lot of things that have come at you, and a lot of things that you've admitted to now, that you've kept bottled up inside before, hidden, that you're now having to deal with. I know this is very difficult. I do know that you loved your parents.
(Emphasis supplied.)
Detective Waldron continued his prior line of questioning that was established before the warnings without any break in *430 the interrogation. He asked many of the same or similar questions. He played on the same themes and employed many of the same techniques, such as stressing that he would not think less of Ross and that he had compassion and understanding because he knew people have tempers and can hurt those they love.[26]
Ross initially asserted that he did not believe that he committed the murders and asserted that he did not think he had anything else to say:
Ross: Well, I told youyouyou're right, about a lot of things. I, I, I don't think I did this. I don't know(unintelligible)
Waldron: I know you say you don't think you did this, but there's the blood on your pants. This wasn't a burglary, somebody who broke into that house.
Ross: I don't think I can help you anymore. I don't think I have anything else to say.[[27]]
In response, Detective Waldron stressed that Ross had to make this "right," that the evidence already told a story as to what happened, and that Ross had to make it right by accepting responsibility for his actions. After he brought up the bloody pants again and discussed additional inferences that he could make based on the crime scene, Ross confessed that he killed his parents.
As the record establishes, Detective Waldron minimized the significance of the warning when it was given by telling Ross that reading the rights was "just a matter of procedure." Further, when Ross asked whether he was going to be arrested, Detective Waldron told him not at that time. However, based on statements made during the evidentiary hearing, Detective Waldron clearly knew he had probable cause to arrest Ross at that time and thus his statements to the contrary were an attempt to lull Ross into a false sense of security. Specifically, Detective Waldron stated that he did not provide Miranda warnings earlier because he did not believe that he had probable cause to arrest Ross, and that once he had probable cause it would have been necessary to administer the Miranda warnings.[28] According to Detective Waldron, it was the discovery of the ski mask that allegedly provided this probable cause and prompted Detective Waldron to advise Ross as to his rights. Yet at this very point during the interrogation, when Ross asked if he was being arrested, Detective Waldron explicitly denied it, telling Ross that he was not being *431 arrested at that time but that they were merely "talking."
We have previously found troubling such attempts to lull a defendant into a false sense of security. See Ramirez, 739 So.2d at 576-77 (finding that the police had lulled a young defendant into a "false sense of security" which was "calculated to delude him as to his true position" when officers denied they were arresting the defendant at the time Miranda warnings were given, despite having "ample probable cause"). In addition, when Ross first hesitated about his desire to talk to the detective and said he did not wish to talk, Detective Waldron did not immediately stop the interrogation.[29] Instead, the detective continued in his request for Ross to talk with him, letting him know that he understood that the decision belonged to Ross, that he would not make Ross's decision for him, that he was attempting to locate Ross's sister, and that he was still "willing" to talk to him.
Finally, prior to resuming the interrogation relating to the bloody pants, rather than informing Ross that his prior admissions could not be used against him, Detective Waldron did the opposite, reminding Ross about everything that happened that day and that there were "a lot of things that [Ross] admitted to now." Detective Waldron continued his prior questioning without any break from the prewarning interrogation, playing on the same themes and using the same tactics as earlier. Based on the tactics used and the fact that Detective Waldron reminded Ross about his admissions immediately after providing him with his Miranda warnings, Ross would likely have had the misimpression that his prior incriminating statements could be used against him. Such a tactic downplayed the significance of the Miranda warnings.
We conclude that in contrast to Davis and more similar to Ramirez, the police minimized and downplayed the significance of the Miranda rights once they were finally administered. In Seibert, the plurality stressed the danger of providing Miranda warnings in the middle of an interrogation, particularly after incriminating statements have already been made:
Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.
Seibert, 542 U.S. at 613, 124 S.Ct. 2601 (footnote omitted).
Similarly in this case, when Ross was finally given his Miranda warnings, he was told, "Anything you say may be used against you in a court of law." Ross could have reasonably believed that all of his prior statements would be admissible regardless as to what he said in the future. Thus, providing Miranda warnings at this point to Ross could have misled Ross about the consequences of the decision to *432 abandon his rights. If Ross believed that what he stated in the previous few hours could have been used against him, any attempt to invoke his "right" to remain silent would have been futile.
As we have made clear, any waiver must be "the product of free and deliberate choice rather than intimidation, coercion, or deception ... and must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Ramirez, 739 So.2d at 575 (quoting Moran, 475 U.S. at 421, 106 S.Ct. 1135). Based on all of the circumstances regarding the delay in administering Miranda and the manner of administering Miranda, we conclude that the officers minimized and downplayed the significance of the warnings so as to undermine the effectiveness of Miranda.

c. Circumstances Surrounding Both the Warned and Unwarned Statements
Finally, as addressed in both Elstad and Seibert, courts review the circumstances surrounding both the warned and unwarned statements including "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Seibert, 542 U.S. at 615, 124 S.Ct. 2601; see also Elstad, 470 U.S. at 310, 105 S.Ct. 1285 (also directing that courts examine the surrounding circumstances when the initial statement is actually coerced, including "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators").
The circumstances surrounding the warned and unwarned circumstances in Elstad are different from those in this case. In Elstad the defendant had first been questioned in the living room of his house with his mother close by. He was then taken to the sheriff's headquarters where full Miranda warnings were given and where no threats or promises were made.
In contrast to Elstad, in this case, the accusatory questioning on January 9 took place in the same small room where Ross had previously been for hours, during which he had already made incriminatory statements. He was questioned not only in the same place, but by the same law enforcement officer, and the substance of the questioning was the same. The questioning was nothing more than one continuous round of interrogation with no meaningful break. Moreover, as emphasized above, after providing Miranda warnings, Detective Waldron again reminded Ross of his prior admissions, which also shows that the second round of questioning was treated as continuous with the first round. Thus, the first and second interrogations (if they can be divided) were conducted in the same manner, in the same room, with the same officers, with only a very short break in between. This is the very problem noted by the Seibert plurality:
Thus, when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." Moran v. Burbine, 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply *433 because Miranda warnings formally punctuate them in the middle.
Seibert, 542 U.S. at 613-14, 124 S.Ct. 2601. This danger was present under the facts of this case, particularly in light of the fact that the interrogation consisted of "integrated and proximately conducted questioning" with no meaningful break and with constant reminders of the preceding multihour interrogation.

d. Conclusion as to Whether Confession Was Voluntary
While police eventually provided Ross with his complete Miranda warnings, the timing and circumstances of the warnings undermined the intent and effectiveness of Miranda, particularly in light of the following: (1) the initial Miranda warnings were deliberately delayed and no warnings were given until after Ross made incriminating statements; (2) police downplayed the significance of the Miranda rights and misled Ross by assuring him that he was not being arrested "at the time" despite the incriminating evidence and Ross's prior statements; (3) before continuing the postwarning interrogation, the police reminded Ross about his earlier admissions; (4) police did nothing to counter the probable misimpression that Ross's prior incriminating statements could be used against him; and (5) police treated the pre- and postwarning interrogation as one continuing round of questioning with only a minimal break but no change in circumstances. In addition, we also take into account that Ross was only twenty-one at the time with no indication of any prior experience with the criminal justice system.
As we explained, the danger of police engaging in the type of tactics exhibited in this case is not only that the prophylactic purpose of Miranda is undermined but that the confession itself is unreliable. Dr. DeClue, Ross's false confession expert, explained the factors that increase likelihood of false confessions, many of which were present in Ross's case, such as increasing the pressure, exaggerating evidence, challenging a person's memory, continuing an interrogation for a lengthy amount of time, showing photographs of the crime scene, and using isolation. The very fact that Ross confessed that he might have taken his mother's jewelry when in fact the evidence reveals that Kathleen Ross herself had actually taken the jewelry from her house and placed it in her mother's house highlights this danger.
Miranda was designed to combat pressures in custodial interrogations and holds that "to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights." Miranda, 384 U.S. at 467, 86 S.Ct. 1602. The inquiry when Miranda warnings are delayed, after a lengthy custodial interrogation, is whether the warnings functioned effectively to apprise the defendant that he or she has the "right to choose between silence and speech." Id. at 469, 86 S.Ct. 1602. When the Miranda warnings are purposely delayed after hours of custodial interrogation, when Miranda warnings are given in such a way as to minimize and downplay their significance, and when the postwarning interrogation is treated as a continuation of the prewarning interrogation, the risk is that the suspect will not understand the rights and the consequences of waiving the rights. The risk is that the very purpose of Miranda is undermined and that the warnings will not function effectively as Miranda requires.
In conclusion, the State must prove that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights and that the postwarning statements were voluntary. Here, the State did not meet *434 that burden based on an analysis of the totality of the circumstances. We reach this conclusion both under an analysis of Elstad and Seibert and under our precedent in Ramirez. Thus, the statements provided after the Miranda warnings were likewise required to be suppressed.

C. Harmless Error Analysis
The conclusion that the multiple statements given by Ross on January 9 should have been suppressed does not end our inquiry. Our caselaw provides that "[t]he erroneous admission of statements obtained in violation of Miranda rights is subject to harmless error analysis." Mansfield v. State, 758 So.2d 636, 644 (Fla.2000) (quoting Caso v. State, 524 So.2d 422, 425 (Fla.1988)).
In State v. DiGuilio, 491 So.2d 1129 (Fla.1986), this Court set forth the harmless error test, which
places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.
Id. at 1135 (citation omitted). As DiGuilio emphasizes, "harmless error analysis must not become a device whereby the appellate court substitutes itself for the jury, examines the permissible evidence, excludes the impermissible evidence, and determines that the evidence of guilt is sufficient or even overwhelming based on the permissible evidence." Id. at 1136. In fact, DiGuilio emphasizes that constitutional errors such as comments on the right to remain silent are "high risk errors because there is a substantial likelihood that meaningful comments will vitiate the right to a fair trial by influencing the jury verdict." Id.
Certainly, in this case, there was evidence of the defendant's guilt, including physical evidence. However, the statements that the defendant made on January 9 were relied on by the State to prove his guilt and repeatedly emphasized. The defendant, in his defense, attempted to show that the confession was a product of coercion by introducing the testimony of Dr. DeClue. In this case, we are unable to conclude beyond a reasonable doubt that there is no reasonable possibility that the substantial admissions heard by the jury did not contribute to the first-degree murder convictions. Compare Ramirez, 739 So.2d at 571-72, 577 (concluding that erroneous admission of confession could not be deemed harmless error despite strong evidence against Ramirez, including that the codefendant had confessed and identified defendant and the police recorded a call where the codefendant and Ramirez discussed the physical evidence and planned to destroy it), and Thompson v. State, 595 So.2d 16, 18 (Fla.1992) (concluding that erroneous admission of confession could not be deemed harmless error because based on the evidence, the court could not state beyond a reasonable doubt that the impermissible admission of the confession did not affect the jury's verdict), with Alvord v. Dugger, 541 So.2d 598, 600-01 (Fla. 1989) (finding the erroneous admission of statements based on an improper Miranda warning was harmless because the statements were not the principal part of the State's case but were cumulative to significant evidence from numerous witnesses, including "primary evidence" presented by the defendant's girlfriend, who testified *435 that the defendant admitted that he killed all the victims and described the crime). Under the circumstances of this case, the State is unable to sustain its heavy burden. We thus find that the convictions for robbery and first-degree murder must be reversed.

CONCLUSION
Based upon the foregoing, we reverse Ross's convictions for robbery and first-degree murder and vacate his sentences of death. We remand this case to the trial court with directions that a new trial be conducted without introducing the portions of statements of January 9 after the officers confronted Ross with the bloody pants.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, and LABARGA, JJ., concur.
QUINCE, C.J., specially concurs with an opinion.
POLSTON J., dissents with an opinion, in which CANADY and PERRY, JJ., concur.
QUINCE, C.J., specially concurring.
I concur in the majority opinion because the police interrogation technique used in this case was a deliberate attempt to get an admission/confession before the defendant exercised his rights. The Seibert-type technique used in this case is one that we have been seeing with more frequency. I believe it is a technique that may put in jeopardy prosecutions that might otherwise not be reversible on appeal. In Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion), the United States Supreme Court explained the significance of Miranda[30] warnings. The Court indicated that a tactic that is designed "to get a confession the suspect would not make if he understood his rights," Seibert, 542 U.S. at 613, 124 S.Ct. 2601, was unconstitutional because such tactics thwart the purpose for which Miranda was designed  to reduce the risk of coerced confessions. See id. at 611-12, 124 S.Ct. 2601.
Recently, in McWatters v. State, 36 So.3d 613 (Fla.2010), we addressed another situation where the police used a similar albeit different kind of technique to attempt to undermine the effectiveness of the Miranda warnings. In McWatters, the police read the suspect his Miranda rights in conjunction with questioning for an offense unrelated to the murder and sexual battery case. McWatters was not questioned after the warnings were given but was instead taken to the police station and placed in a room which contained evidence relating to the murder case. He was later told that he had been taken to the wrong room; he was then paraded through the police station past witnesses related to the murder case. Although we found that the defendant knowingly waived his rights, it was of concern that the police used this technique, especially given the fact that the officer admitted that the ruse was being used to keep McWatters from invoking his rights.
In this case, the officer likewise testified that he knew the interview on January 9 would be his last opportunity to get an uncounselled statement from the defendant. Therefore, the officer boxed the defendant into a small interrogation room with other officers coming in and out, he would not allow Ross to leave, and all the while the officer was telling Ross he was not under arrest. Yet at the same time the officer was continually confronting Ross with evidence against him. It is *436 obvious that under the circumstances the defendant was NOT free to leave; thus Miranda warnings should have been given at that point. It was only after Ross made some incriminating statements that Miranda warnings were given. And even after the warnings were given, the officer downplayed their significance by making it seem as if the warnings were only a formality that the officer had to comply with.[31]
Seibert recognized that this type of "question-first" tactic is in direct conflict with the underlying purpose of the Miranda warnings. See Seibert, 542 U.S. at 611, 124 S.Ct. 2601. It is worth noting that both the interrogation here and the interrogation in McWatters took place before the Supreme Court issued its opinion in Seibert. However, if police continue to use these types of techniques in circumstances where it is clear that the focus of any investigation has turned to the defendant and Miranda warnings should be given, I fear that we will have more cases that will be reversed on appeal.
POLSTON, J., dissenting.
After holding an evidentiary hearing that produced more than 1,000 pages of transcript, the trial court found that the police officers in this case did not deliberately withhold Miranda warnings. This finding of fact is supported by competent substantial evidence in the record. Because of this finding of fact, the standard enunciated in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), applies here. The majority's holding is contrary to the well-settled Florida law that Elstad applies in these circumstances. See, e.g., Davis v. State, 990 So.2d 459, 466 (Fla.2008). Under the Elstad standard, Ross's confession after the Miranda warnings is admissible. Accordingly, I respectfully dissent.[32]

I. The Officers Did Not Deliberately Withhold Miranda

As the Seventh Circuit Court of Appeals accurately explained, "[t]he question of whether the interrogating officer deliberately withheld Miranda warnings will invariably turn on the credibility of the officer's testimony in light of the totality of the circumstances surrounding the interrogation. This is a factual finding entitled to deference on appeal. ..." United States v. Stewart, 536 F.3d 714, 719-20 (7th Cir. 2008). Moreover, as this Court has explained, "[a]n appellate court reviewing a ruling on a motion to suppress presumes that a trial court's findings of fact are correct and reverses those findings only if they are not supported by competent, substantial evidence." Cuervo v. State, 967 So.2d 155, 160 (Fla.2007) (citing Connor v. State, 803 So.2d 598, 608 (Fla.2001)).
*437 Here, the trial court's finding that the officers did not deliberately withhold Miranda warnings is supported by competent substantial evidence in the record. For example, Detective Waldron testified at the evidentiary hearing that he was trained by the Manatee County Sheriff's Office to read a suspect the Miranda warnings "[a]t a point in time where a person's not going to be free, their movements are restricted and they're not just free to get up and walk out." And, when asked on cross-examination why he waited until the latter part of January 9 to read Ross his Miranda rights, Detective Waldron responded as follows:
Earlier on there still was insufficient evidence or enough in my mind probable cause to charge Blaine Ross. And he had requested to talk about what had been discussed on the news and the news media, so my intention was to answer his questions and to try to see if his statement wavered at all from what his previous statement was. And then if there was any indication or inconsistencies or anything incriminating, then at that point in time I felt there would be probable cause to arrest him, which would necessitate the reading of Miranda.

Additionally, the record reflects that Detective Waldron read Ross the Miranda warnings after learning that a bloody ski mask had been discovered in Ross' car, evidence that Detective Waldron thought provided probable cause at the time. After a break and immediately before advising Ross of his Miranda rights, Detective Waldron reentered the interview room and stated to Ross, "There's a couple of things that I discovered, and before we go any further I want to cover this with you. ..." Once Detective Waldron fully explained Ross' rights, ensured that Ross understood his rights, and Ross waived those rights, Detective Waldron immediately proceeded to ask Ross about the ski mask that the police found in his car. Accordingly, there is competent substantial evidence in the record to support the trial court's factual finding that the officers did not deliberately delay Miranda warnings and did not engage in a calculated strategy to secure an unwarned confession that could then be used to secure a warned confession.
Instead of deferring to this factual finding, the majority extensively reweighs the evidence and reevaluates the credibility of Detective Waldron. For example, the majority recognizes that at the evidentiary hearing "Detective Waldron stated that he did not provide Miranda warnings earlier because he did not believe that he had probable cause to arrest Ross." Majority op. at 430. However, despite this testimony that supports the trial court's finding of fact, the majority concludes that "Detective Waldron clearly knew he had probable cause to arrest Ross at that time." Id. The majority reaches its contrary finding, which evaluates the credibility of Detective Waldron's testimony, by focusing upon a supposed conflict between Detective Waldron telling Ross during questioning that Ross was not under arrest and Detective Waldron's evidentiary hearing testimony that that he did not believe he had probable cause until the discovery of the bloody ski mask in Ross' car. Id. ("According to Detective Waldron, it was the discovery of the ski mask that allegedly provided this probable cause and prompted Detective Waldron to advise Ross as to his rights. Yet at this very point during the interrogation, when Ross asked if he was being arrested, Detective Waldron explicitly denied it. ..."). Of course, a police officer's intent during questioning a suspect often conflicts with what the police officer actually tells the suspect. See, e.g., Davis v. State, 859 So.2d 465, 472 (Fla.2003) (finding a confession voluntary even though *438 defendant claimed officers stated that they were investigating a missing person's case when the officers were actually investigating a murder). However, in this case, the conflict that the majority reaches is not even a conflict. A police officer can have probable cause to arrest a suspect, but not formally place the suspect under arrest.
Further, the majority gives great weight to testimony that it was the department's policy to administer Miranda warnings once questioning took on an accusatory nature. See majority op. at 425. However, the majority apparently discounts other testimony regarding the policy that was before the trial court charged with making factual findings. Specifically, while both Detective Waldron and another officer testified that there was a "general order" that stated that Miranda warnings were to be provided once accusatory questioning occurred, both also testified that "general orders" are guidelines and not requirements. In fact, when specifically asked on cross-examination whether he had been trained to administer Miranda warnings once accusatory questioning took place, Detective Waldron stated that he was taught that it depends upon the particular circumstances. Detective Waldron also testified that the manner in which he questioned Ross did not violate department policy.
It was improper for the majority to discard the trial court's factual finding regarding deliberateness and reevaluate the evidence for itself, particularly since this factual finding is heavily based upon a determination of Detective Waldron's credibility. See Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976) ("[T]he function of the trial court is to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor and credibility of the witnesses appearing in the cause. It is not the function of the appellate court to substitute its judgment for that of the trial court through re-evaluation of the testimony and evidence. ..."). Whether this Court properly defers to the trial court's deliberateness finding is important in this case because it determines whether this Court properly applies the standard from Elstad or erroneously applies the standard from Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

II. Elstad Applies, Not Seibert

In Elstad, 470 U.S. at 310-11, 105 S.Ct. 1285, the United States Supreme Court held that the failure to provide Miranda warnings before an uncoerced confession does not necessarily render a second and warned statement inadmissible.[33] Rather, the admissibility of the second statement is governed by whether the subsequent waiver was voluntary and knowing. Elstad, 470 U.S. at 309, 105 S.Ct. 1285. If a defendant is fully informed of and voluntarily waives his Miranda rights, the statement after the Miranda warnings is admissible. See Davis v. State, 698 So.2d 1182, 1189 (Fla.1997) ("Shortly after confessing in his holding cell, Davis gave a taped statement in which he voluntarily gave the same information contained in his prior statement. ... This [second] statement was clearly admissible because Davis was fully informed of (and waived) his Miranda rights before the start of the taping session." (citing Elstad, 470 U.S. 298, 105 S.Ct. 1285)). Whether the second statement was voluntary requires a review *439 of the totality of the circumstances. See Ramirez v. State, 739 So.2d 568, 575-76 (Fla.1999) (applying Elstad).
The United States Supreme Court addressed this area of the law again in Seibert, 542 U.S. 600, 124 S.Ct. 2601. The United States Supreme Court held that a second confession was inadmissible when a police officer intentionally questioned a suspect without administering Miranda in order to elicit an unwarned confession that was then used to elicit a second warned confession. The plurality explained the following:
The threshold issue when interrogators question first and warn later is ... whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as Miranda requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?
Seibert, 542 U.S. at 611-12, 124 S.Ct. 2601. The plurality then listed several factors to assist in determining whether the Miranda warnings were effective:
the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.
Id. at 615, 124 S.Ct. 2601. However, Justice Kennedy's concurrence in Seibert is dispositive as he provided the necessary fifth vote and the narrowest grounds. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Justice Kennedy explained in his concurrence that he "would apply a narrower test applicable only in the infrequent case." Seibert, 542 U.S. at 622, 124 S.Ct. 2601. Specifically, Justice Kennedy set forth the following test:
The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver. For example, a substantial break in time and circumstances between the prewarning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Cf. Westover v. United States, decided with Miranda v. Arizona, 384 U.S. 436[, 86 S.Ct. 1602, 16 L.Ed.2d 694] (1966). Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient.
Id.
The majority is improperly mixing the Elstad and Seibert standards together; rather, these are separate standards applicable in different circumstances. See, e.g., majority op. at 432 ("[A]s addressed in both Elstad and Seibert, courts review the circumstances surrounding both the warned and unwarned statements including `the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of *440 the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.'" (quoting Seibert, 542 U.S. at 615, 124 S.Ct. 2601 (plurality opinion) and citing Elstad, 470 U.S. at 310, 105 S.Ct. 1285)); majority op. at 424 ("The caselaw demonstrates that the analysis of the admissibility of statements made following a custodial interrogation and after the delayed administration of Miranda warnings is one of the totality of the circumstances, with the following being factors important in making this determination: (1) whether the police used improper and deliberate tactics in delaying the administration of the Miranda warnings in order to obtain the initial statement; (2) whether the police minimized and downplayed the significance of the Miranda rights once they were given; and (3) the circumstances surrounding both the warned and unwarned statements including `the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of the police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.'" (footnotes omitted) (citing Elstad, 470 U.S. at 314, 105 S.Ct. 1285; Davis, 859 So.2d at 471 and quoting Seibert, 542 U.S. at 615, 124 S.Ct. 2601 (plurality opinion))).
It is important to recognize that the standard enunciated in Elstad and the standard enunciated in Seibert are different, coexisting standards. As Justice Kennedy's opinion in Seibert explains, "[t]he admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed." Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment). Elstad solely requires an inquiry into whether the defendant voluntarily and knowingly waived his Miranda rights before the second confession. See Elstad, 470 U.S. at 309, 105 S.Ct. 1285 ("Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."). In contrast, the Seibert standard presumes that the Miranda warnings before the second confession were ineffective. See Seibert, 542 U.S. at 617, 124 S.Ct. 2601 ("These circumstances must be seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk."); Id. at 620, 124 S.Ct. 2601 (Kennedy, J., concurring) ("As Justice Souter points out, the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made."). Due to this presumption, the Seibert standard as enunciated in Justice Kennedy's dispositive concurrence includes an inquiry into the additional "curative" factors listed above (such as the break in time and circumstances between the first and second statements), which are beyond the voluntariness inquiry required by Elstad.
It is well-settled under Florida law that we apply Elstad as distinct from Seibert. This Court held in Davis v. State, 990 So.2d 459, 466 (Fla.2008) (quoting Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment)), that we apply Elstad unless officers used "the question-first method `in a calculated way to undermine the Miranda warning.'" *441 Specifically, in Davis, 990 So.2d at 464-66, this Court addressed the postconviction argument that the defendant's confession was taken in violation of Seibert. However, because the officers did not deliberately withhold Miranda in a calculated attempt to undermine the warnings, this Court held that Elstad applied to the defendant's confession, not Seibert. Davis, 990 So.2d at 466; see also Tengbergen v. State, 9 So.3d 729, 735 (Fla. 4th DCA 2009) ("[U]nless the officers deliberately withheld warnings, Elstad controls Tengbergen's Miranda claim."); Jump v. State, 983 So.2d 726, 729 (Fla. 1st DCA 2008) ("[T]hese principles of Elstad continue to control `unless the deliberate two-step strategy was employed.'" (quoting Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment))); State v. Lebron, 979 So.2d 1093, 1096-97 (Fla. 3d DCA 2008) ("Justice Kennedy went on to say, `The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed.' That portion of Justice Kennedy's concurrence is decisive here, for there was no deliberate use of the two-step strategy under the circumstances of the present case." (quoting Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment))); State v. Pitts, 936 So.2d 1111, 1136 (Fla. 2d DCA 2006) ("When we consider the interrogation of Pitts under the test articulated in Seibert by Justice Kennedy, we can readily conclude that Pitts' post-Miranda statements should not be suppressed. The record before us does not show that `the two-step interrogation technique was used in a calculated way to undermine the Miranda warning.'" (quoting Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment))).
The Seventh Circuit aptly summarized the state of the law regarding two confessions with an intervening Miranda waiver as follows:
What emerges from the split opinions in Seibert is this: at least as to deliberate two-step interrogations in which Miranda warnings are intentionally withheld until after the suspect confesses, the central voluntariness inquiry of Elstad has been replaced by a presumptive rule of exclusion, subject to a multifactor test for change in time, place, and circumstances from the first statement to the second. According to the plurality, the multifactor testtiming and location of interrogations, continuity of police personnel, overlapping content of statements, etc.measures the "effectiveness" of midstream Miranda warnings and applies in all cases involving sequential unwarned and warned admissions. In Justice Kennedy's view, however, an inquiry into change in time and circumstances between the prewarning and postwarning statementswhat he called "curative steps"is necessary only in cases involving the deliberate use of a two-step interrogation strategy calculated to evade the requirements of Miranda. Justice Kennedy thus provided a fifth vote to depart from Elstad, but only where the police set out deliberately to withhold Miranda warnings until after a confession has been secured. Where the initial violation of Miranda was not part of a deliberate strategy to undermine the warnings, Elstad appears to have survived Seibert.

Stewart, 388 F.3d at 1090;[34]see also United States v. Mashburn, 406 F.3d 303, 309 (4th Cir.2005) ("The admissibility of post-warning *442 statements is governed by Elstad unless the deliberate `question-first' strategy is employed. If that strategy is deliberately employed, postwarning statements related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statements are made." (citation and footnote omitted)).
As the majority explains in footnote nine, there is a split among the federal circuits regarding the applicability of Justice Kennedy's concurrence in Seibert. However, no such split exists in the State of Florida. This Court as well as four district courts of appeal have all held that Justice Kennedy's concurrence in Seibert is the law in Florida. Stated otherwise, prior to this decision, this Court and the First, Second, Third, and Fourth District Courts of Appeal have all applied the standard enunciated in Justice Kennedy's concurrence in Seibert, not the standard enunciated in the plurality's opinion. Davis, 990 So.2d at 465-66 (quoting and applying Justice Kennedy's concurrence in Seibert and recognizing that "Justice Kennedy stated that he would apply a narrower test than the plurality"); Tengbergen, 9 So.3d at 735 ("Florida courts have heretofore applied Justice Kennedy's rule [in Seibert], as it represents the narrower view."); Jump, 983 So.2d at 728 (applying Justice Kennedy's concurrence in Seibertnot the plurality opinionbecause, "[a]s our sister courts have recognized, Justice Kennedy's concurring opinion in Seibert offers the narrowest grounds"); Lebron, 979 So.2d at 1096 ("Justice Kennedy's opinion concurring in the judgment is the dispositive opinion. Addressing the exact issue now before us, Justice Kennedy stated that `it would be extravagant to treat the presence of one statement that cannot be admitted under Miranda as sufficient reason to prohibit subsequent statements preceded by a proper warning.'" (quoting Seibert, 542 U.S. at 620, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment))); Pitts, 936 So.2d at 1136 ("[T]he holding of Seibert should be viewed as the position taken by Justice Kennedy, which articulates the `narrowest grounds' for the judgment of the Court."). Consequently, the majority opinion is receding from this Court's precedent as well as overruling the four district courts' decisions by improperly mixing together the standard in Elstad, Justice Kennedy's standard in Seibert, and the plurality's standard in Seibert.[35]
In this case, because of the trial court's factual finding that the withholding of Miranda *443 warnings was not deliberate, Elstad applies. See Mashburn, 406 F.3d at 309 ("Here, the district court found no evidence that the agents' failure to convey Miranda warnings to Mashburn was deliberate or intentional. Therefore, the admissibility of Mashburn's statements is governed by Elstad." (citations omitted)). Applying Elstad's voluntariness inquiry, I believe this case is analogous to Davis v. State, 859 So.2d 465 (Fla.2003).
In Davis, this Court applied Elstad and held that a second confession given after Miranda warnings was voluntary and therefore admissible. Davis, 859 So.2d at 471-72. The defendant admitted that he killed the victim in an initial discussion with officers. Id. at 471. Then, an officer administered Miranda warnings, and Davis signed a written waiver. Id. Thereafter, Davis gave a recorded confession. Id. In ruling that the recorded confession was admissible, this Court stressed that the officers "carefully read Davis his Miranda rights, explaining each section of the waiver form, clearly reading aloud and explaining each right, and confirming after each right that Davis understood." Id. at 472. This Court also noted that Davis signed a written waiver and that the officers did not attempt to downplay the Miranda warnings. Id.
As in Davis, here, Detective Waldron carefully read Ross' Miranda rights to him, asked if he understood those rights, obtained a written waiver, and then asked if Ross wished to talk to him. Ross stated that he did.[36] Only then did the interview proceed. "In these circumstances, a careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible." Elstad, 470 U.S. at 310-11, 105 S.Ct. 1285. Therefore, like the second confession in Davis, Ross' post-Miranda confession was voluntary and admissible. See id. at 311, 105 S.Ct. 1285 ("The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed *444 as an `act of free will.'" (quoting Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963))).

III. Conclusion
I would defer to the trial court's factual finding that the officers in this case did not deliberately withhold the Miranda warnings because this finding is supported by competent substantial evidence. As a result, I would employ the Elstad standard, which applies to nondeliberate delays in Miranda warnings. See Davis, 990 So.2d at 466 (holding that we apply Elstad unless officers used "the question-first method `in a calculated way to undermine the Miranda warning.'" (quoting Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment))). Under a proper application of the Elstad standard, Ross' post-Miranda confession is admissible. The trial court did not err in denying Ross' motion to suppress it.
Accordingly, I respectfully dissent.
CANADY and PERRY, JJ., concur.
NOTES
[1] The medical examiner found no injuries on Richard Ross from the ropes and opined that the ropes did not play a part in Richard Ross's death. He was unable to make the same determination as to Kathleen Ross because she had a significant blunt impact injury to that same area.
[2] Ross was also interrogated by police on January 9, when he gave increasingly inculpatory statements. On January 12, he was interviewed while he was in jail. All of the interviews were audio recorded, and the interrogation on January 9 was also video recorded.
[3] Ross asserted that he was angry at his father because of the affair.
[4] Kathleen Ross's jewelry was missing from her house. Evidence presented at trial revealed that a few days before the murder, Kathleen Ross stopped by her mother's house with a paper bag, which she hid in the crawlspace of her mother's attic. After the murder, Ross's sister, Kimberly, found the paper bag with Kathleen Ross's jewelry box and jewelry inside.
[5] Dr. DeClue also testified at the hearing on the motion to suppress.
[6] We conclude that no extensive discussion is necessary as to the January 12 statements, because on that date the Miranda warnings were given once interrogation began and the court admitted only statements that were made after the Miranda warnings were administered.
[7] In the motion to suppress, Ross challenged both the statements made on January 7-8 and on January 9. On appeal, Ross focuses mostly on the January 9 statements. As to the January 7 and 8 interviews, we conclude that the trial court did not err in finding that Ross was not in custody at that time for the following reasons: Ross voluntarily went to the sheriff's office; the detective was merely obtaining Ross's statement as to the events surrounding his parents' deaths; although the detective did question Ross about conflicting statements, Ross was not confronted with the same type of incriminating evidence of his guilt; and Ross was often left by himself at the sheriff's office when he was not being interviewed, thus implying that he was free to leave. Because this was not an in-custody interrogation, the court did not err in admitting these statements.
[8] Such statements, however, can be used as impeachment during cross-examination. Id.
[9] While we focus on Justice Kennedy's concurrence in analyzing the holding of Seibert, there is a split in the federal circuits regarding whether the plurality rather than his concurrence operates as the controlling precedent. In fact, while the case cited by the dissent, United States v. Stewart, 388 F.3d 1079 (7th Cir.2004), relies on Justice Kennedy's concurrence as to the holding of Seibert, more recent circuit cases have called into question the reliance on Justice Kennedy's concurrence rather than the plurality. See, e.g., United States v. Heron, 564 F.3d 879, 884 (7th Cir.2009) ("[W]e conclude that the Marks [v. United States, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)] rule is not applicable to Seibert. Although Justice Kennedy provided the crucial fifth vote for the majority, we find it a strain at best to view his concurrence taken as a whole as the narrowest ground on which a majority of the Court could agree."); United States v. Pacheco-Lopez, 531 F.3d 420, 427 n. 11 (6th Cir.2008) (recognizing split in circuits as to whether Justice Kennedy's concurrence is controlling precedent); United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir.2006) ("Determining the proper application of the Marks rule to Seibert is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court."). In Heron, 564 F.3d at 885, the Seventh Circuit recognized that it had not settled on a definitive approach to Seibert and held that its more recent decision in United States v. Peterson, 414 F.3d 825 (7th Cir.2005), "may be in some tension with our decision in Stewart and Justice Kennedy's intent-based test."
[10] The dissent asserts that Elstad and Seibert are different, coexisting standards. While it is true that a "deliberate two-step strategy" to circumvent Miranda is different from a good-faith mistake, the analysis of the factors to be considered overlap. Elstad itself rejected setting forth a rigid rule but rather directed courts to examine "the surrounding circumstances and the entire course of police conduct" in determining whether the second statement was voluntary. Elstad, 470 U.S. at 318, 105 S.Ct. 1285 (emphasis added). In its decision, the United States Supreme Court repeatedly emphasized that the relevant inquiry is whether the second statement was voluntarily made and provided examples of relevant circumstances that courts should consider when a prior statement was coerced, including "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." Id. at 310, 105 S.Ct. 1285. In Seibert, the plurality likewise stressed that courts must determine the voluntariness of the second statement and resolve whether Miranda warnings, given midstream, could effectively inform a defendant as to whether he had a real choice to not talk. Seibert, 542 U.S. at 612, 124 S.Ct. 2601. The plurality then set forth additional factors that were relevant to such an inquiry. Id. at 615, 124 S.Ct. 2601. After doing so, the plurality reviewed Elstad and held that the factual differences in Elstad showed that questioning that occurred at the station house in that case was a "new and distinct experience" from the brief conversation that occurred at the defendant's house, and thus concluded that the Miranda warnings given in Elstad did present a genuine choice to the defendant. Id. at 615-16, 124 S.Ct. 2601.
[11] See Elstad, 470 U.S. at 314, 105 S.Ct. 1285 ("We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion [as to the later statement]." (emphasis supplied)).
[12] See Davis, 859 So.2d at 471 (noting that under Elstad, "a careful and thorough administration of Miranda warnings serves to cure the condition that made an unwarned statement inadmissible"); Ramirez, 739 So.2d at 574-75 (holding that postwarning statements had to be suppressed where officers employed a concerted effort to minimize and downplay the significance of the Miranda rights).
[13] Seibert, 542 U.S. at 615, 124 S.Ct. 2601 (reviewing the following factors: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first"); see also Elstad, 470 U.S. at 310, 105 S.Ct. 1285 ("When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession.").
[14] See, e.g., Bevel v. State, 983 So.2d 505, 515-16 (Fla.2008) (reviewing intelligence as one of the circumstances to be considered in determining whether a defendant knowingly and voluntarily waived his rights); Chavez v. State, 832 So.2d 730, 750 (Fla.2002) (reviewing defendant's understanding of the English language and noting that Miranda warnings were given in Spanish as one of the circumstances to be considered in determining whether a defendant knowingly and voluntarily waived his rights); Ramirez, 739 So.2d at 576 (reviewing age and experience in criminal justice system as one of the circumstances to be considered in determining whether a defendant knowingly and voluntarily waived his rights).
[15] We stress in this regard that the mere fact that Detective Waldron violated his department's procedures, which would have required the Miranda warnings sooner than the law may require, is not dispositive of our inquiry. Rather, we focus on whether the tactics used in the interrogation were a deliberate attempt to wear down Ross's resolve and produce a confession, as opposed to a good-faith mistake.
[16] For example, during this portion of the interrogation, Ross stated, "You made me dig inside and think about it, and you've also given me hard evidence that puts me at the crime, and I can'tI can'tI can'tI can't remember if I did this or not. I don't know. I mean, youyou have solid evidence, blood on my pants and everything, but I don't remember doing this, if I did it."
[17] Under the State's theory, it could be argued that Ross never actually "confessed," since he always maintained that he had no memory of actually committing the murders. His ultimate confession addressed acts that happened only after his parents were murdered.
[18] Ross made numerous admissions during this time, each of which was followed by denials that he murdered his parents. For example, he stated, "I can tell you that I didn't plan to kill my parents. I can tell you that I do bottle things up, and things that you've said does [sic] make sense. They do make sense to me, that I can have done this. I could have been so angry, done this. But I don'tI can't put myself there. I don't remember if I was there, so I can't tell you if I did it or not."
[19] The dissent relies on United States v. Stewart, 536 F.3d 714 (7th Cir.2008), for its statement that the issue of whether the warnings were deliberately withheld is solely a question of credibility, which is a factual finding of the trial court entitled to deference. However, even Stewart acknowledges that there is "not yet a general consensus among the circuits about the standard of review that applies to Seibert-deliberateness determinations." Id. at 719.
[20] The majority of the trial court's order addresses the January 7 and January 8 interviews and whether Ross was in custody prior to being given his Miranda warnings. The trial court concluded that Ross was not in custody, a finding with which we disagree.
[21] Although the trial court issued an extensive order regarding the motion to suppress, the trial court's factual findings as to this issue are minimal. Specifically, the court stated, "There is no evidence that the detectives deliberately withheld Miranda until Defendant confessed." The court based this conclusion on two statements: (1) Waldron recognized that he was taught to provide Miranda warnings when a person is no longer free to leave; and (2) he read Ross his Miranda warnings after he learned of the ski mask.
[22] Our conclusion is further supported by decisions of other courts that have been similarly troubled by clear custodial interrogations that occurred without providing Miranda warnings first and thus have concluded that police deliberately delayed providing Miranda warnings in order to obtain incriminating statements. See, e.g., United States v. Williams, 435 F.3d 1148, 1159 (9th Cir.2006) (noting that after law enforcement detains a suspect and subjects him to interrogation, "there is rarely, if ever, a legitimate reason to delay giving a Miranda warning until after the suspect has confessed" unless the interrogator wants to weaken the warning's effectiveness); United States v. Ollie, 442 F.3d 1135, 1141 (8th Cir.2006) (holding that the delay in not providing Miranda warnings was deliberate where police chief interrogated suspect until obtaining a confession and an agreement to provide a written confession and only then provided Miranda warnings); Edwards v. United States, 923 A.2d 840, 849 (D.C.2007) (holding that the delay was deliberate where the detective acknowledged that suspect was in custody, asked questions he knew could lead to incriminating answers, and knew the suspect had not been given his Miranda warnings); People v. Lopez, 229 Ill.2d 322, 323 Ill.Dec. 55, 892 N.E.2d 1047, 1070-71 (2008) (holding that although the detectives explicitly denied using the "question first, warn later" technique, they deliberately engaged in an improper two-step interrogation by questioning a suspect without providing Miranda warnings when they acknowledged that the suspect would not have been free to leave the police station if he had attempted to do so); State v. Dailey, 273 S.W.3d 94, 109-10 (Tenn. 2009) (holding that the delay was deliberate despite the fact that officers testified that they did not provide Miranda rights because they were not yet arresting the suspect based on the following factors: (1) police called the suspect to the police station under false pretenses; (2) although the officers asserted the suspect was not under arrest, they failed to advise the defendant that he was not under arrest and that he was free to leave at any time; and (3) after he confessed and was provided with Miranda rights, they failed to inform him that his initial statement was inadmissible against him).
[23] Although Ross raised the claim that police failed to abide by his invocation of the right to remain silent, he did not raise this particular incident, but points to a later portion in the interrogation where he alleges that he invoked his right to remain silent. However, we consider how Detective Waldron responded to this statement as a part of our determination of whether Detective Waldron minimized or downplayed the significance of the Miranda rights, as addressed below.
[24] In actuality, as Waldron testified at trial, he was not trying to get in touch with Ross's sister.
[25] The ski mask in fact was not related to the murder and was not used at trial.
[26] For example, shortly after reminding Ross as to his prior admissions, he told Ross:

And that's why I'm capable of having some understanding and feelings and compassion. And that's why I'm talking to you this way. Okay? You're a human being. As human beings we make mistakes. Unfortunately we hurt people, and we hurt people we don't mean to. We have tempers, we lose control, we do things that we later regret. And also being human, we're allowed to go forward from those mistakes.... And I know what it is to hurt, the same as you do.
[27] Ross asserts that this was an attempt to invoke his right to remain silent. This statement in isolation would be an equivocal invocation of his right to remain silent, which does not require the interrogation to stop. See, e.g., State v. Owen, 696 So.2d 715, 717 n. 4, 718 (Fla.1997) (holding that the statements "I'd rather not talk about it" and "I don't want to talk about it" were equivocal and, thus, the police had no duty to clarify the suspect's intent and could proceed with the interrogation). However, we consider Ross's statements and Detective Waldron's responses as part of the totality of the circumstances as to whether Ross's waiver was voluntary, knowing, and intelligent.
[28] Of course, administration of the Miranda warnings does not depend on whether there is probable cause to arrest the individual, but on whether the interrogation is custodial.
[29] As addressed above, after Detective Waldron finally provided Ross with his Miranda rights, he asked Ross whether Ross wished to talk to police, and Ross replied, "I don'tI can't tell you anything different."
[30] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[31] Although the defendant does not challenge his statement based on the invocation of his rights, there is also some question here as to whether or not the defendant invoked his right to silence after the reading of the warnings. When asked if he wished to waive the rights and talk with the officer, the defendant said, "I don't  I can't tell you anything different." However, the officer continued to talk with Ross, and Ross thereafter gave other incriminating statements.
[32] I agree with the majority that the statements made by Ross on January 9, once he was confronted with the evidence of blood on his pants, but before the Miranda warnings were given, are inadmissible. However, that error was harmless. Before the Miranda warnings on January 9, Ross did not confess. Rather, Ross merely admitted that, because he could not remember, it was possible that he killed his parents, but that he did not believe that he had done so. There is not a reasonable possibility that these equivocal statements affected the verdict given the admissible evidence in this case, including his parents' blood on his pants and his confession after the Miranda warnings.
[33] In this case, on January 9, Ross went to the police station on his own and voluntarily met with Detective Waldron. In fact, prior to this meeting, Ross had left several phone messages for Detective Waldron indicating his desire to discuss the case with the detective. Therefore, Ross' statements on January 9 prior to the Miranda warnings were uncoerced.
[34] The Seventh Circuit has yet to decide exactly how it will apply Seibert. In its most recent opinion on the subject, the Seventh Circuit decided that the statements at issue would be admissible under any possible rule from Seibert. United States v. Heron, 564 F.3d 879, 885 (7th Cir.2009) ("We have no need here to resolve once and for all what rule or rules governing two-step interrogations can be distilled from Seibert. This is because Heron's May 11 statements would be admissible under any test one might extract."). However, the Seventh Circuit in Heron repeated its prior statement that Elstad survives Seibert and again deferred to the trial court's finding of fact that the delay in Miranda warnings was not deliberate. Id. at 885-86.
[35] The majority cites the following language from Elstad as its support that Elstad requires an examination of the same factors as the plurality in Seibert would require: "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." Majority op. at 420 (quoting Elstad, 470 U.S. at 310, 105 S.Ct. 1285 (citing Westover v. United States, decided together with Miranda, 384 U.S. at 494, 86 S.Ct. 1602)). However, this language does not apply every time there are two confessions with an intervening Miranda waiver. Rather, this language referencing Westover only applies after a determination that the pre-Miranda statements were coerced, which was not the case in Elstad. As the United States Supreme Court explained in Elstad,

[t]he failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. See New York v. Quarles, 467 U.S., at 654, and n. 5[, 104 S.Ct. 2626]; Miranda v. Arizona, supra, at 457[, 86 S.Ct. 1602]. Of the courts that have considered whether a properly warned confession must be suppressed because it was preceded by an unwarned but clearly voluntary admission, the majority have explicitly or implicitly recognized that Westover's requirement of a break in the stream of events is inapposite. In these circumstances, a careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an "act of free will." Wong Sun v. United States, 371 U.S., at 486[, 83 S.Ct. 407].
Elstad, 470 U.S. at 310-11, 105 S.Ct. 1285 (footnote omitted). Indeed, in Elstad, the United States Supreme Court reversed the Oregon court's holding that, despite the fact that the pre-Miranda statements were uncoerced, "lapse of time, and change of place from the original surroundings are the most important considerations" in determining the admissibility of the post-Miranda statements. Id. at 303, 105 S.Ct. 1285 (quoting State v. Elstad, 61 Or.App. 673, 658 P.2d 552, 554 (1983), rev'd, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), which cited Westover v. United States, 384 U.S. 436, 496, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).
[36] Contrary to the majority's characterization of this conversation on pages 51 and 55, it is clear from the transcript that Ross was not attempting to invoke his right to remain silent. Ross initially stated, "I can't tell you anything different." (Emphasis added.) He did not say that he would not talk. Instead, after he was directly asked, "You're indicating that you want to talk to me; correct?" Ross responded, "Yes." Ross then signed the written waiver.